# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW MEXICO

VERONICA GALVAN,

    Plaintiff,

v.                                                                 Civ. No. 16-535 GJF/KRS

BOARD OF COUNTY
COMMISSIONERS FOR CURRY
COUNTY, NEW MEXICO,

    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendant's "Motion for Summary Judgment No. I: Notice Under the New Mexico Tort Claims Act" ("Motion") [ECF No. 24], filed February 17, 2017. After careful consideration of the pertinent law, the parties' briefing, and the testimony and exhibits introduced at the May 11, 2017 evidentiary hearing, the Court will grant the Motion and will dismiss for lack of jurisdiction Plaintiff's claim of negligence under the New Mexico Tort Claims Act. For the reasons discussed below, the Court concludes that the Defendant did not have actual notice that litigation was likely to ensue against it as a result of the inmate-on-inmate assault that Plaintiff suffered in the Curry County Detention Center. Furthermore, the Court concludes that Plaintiff was not physically or legally incapacitated in the aftermath of the assault so as to excuse her failure to comply with the notice requirements of the New Mexico Tort Claims Act.

## I. BACKGROUND AND PROCEDURAL HISTORY

This case arises out of Plaintiff's incarceration at the Curry County Detention Center "Women's Annex" in Clovis, New Mexico. Pl.'s Compl. 2, ECF No. 1. Plaintiff was incarcerated there from January 21, 2014, through May 30, 2014, when she was transferred to

another facility. *Id.* Plaintiff alleges that on or about February 1, 2014, she was battered by another inmate, during which she sustained a broken hand, scratches on her face, and bruising on her head, knee, and face. *Id.* at 3-4. Plaintiff further alleges that the incident occurred in part due to overcrowding, insufficient staffing of correctional officers and staff, and inadequate building maintenance, including roof leaks and toxic black mold. *Id.* at 3.

On May 20, 2014, in preparation for filing her lawsuit, Plaintiff submitted written notice via counsel of her tort claim to the Curry County Clerk. Def.'s Mot., Ex. C at 3-4, ECF No. 24. Plaintiff's written notice stated in part:

> Notice is hereby given to you pursuant to the New Mexico Tort Claims Act (41-4-1 et seq.), that my client Veronica Galvan was beaten by an inmate by the name of Kimberly Lee More [sic] in January, 2014. An incident report was made and the Curry County Adult Detention Center was on actual notice of the incident. Ms. Galvan suffered [sic] was pulled out of a chair and beaten (including being kneed in the face), resulting in a scratch on her face (chin) and several bumps on her head. She continues to suffer headaches from the incident but has been denied proper medical care including but not limited to the performance of an M.R.I. of her skull along with other diagnosis and treatment of her condition. Ms. Galvan had indicated to Detention Center employees that there was a problem with Ms. Kimberly Moore being housed in the annex because she is the wife of Mr. Guerra. Ms. Galvan is a close friend of the Perez family. Despite this known animosity, Ms. Galvan was continued to be housed with her in the Women's Annex. Notice of tort claim pursuant to § 41-4-6 NMSA is hereby given for the negligence of the Curry County Board of Commissioners in the operation and/or maintenance of the Women's Annex and failure to provide Ms. Galvan with proper medical care in a timely fashion in violation of § 41-4-9 and 10 NMSA. A claim for violation of Ms. Galvan's civil rights, and privileges and immunities secured by the constitution and laws of the United States and New Mexico is also asserted pursuant to § 41-4-12 NMSA.

*Id.*

Plaintiff then filed this case on June 7, 2016, asserting claims against Defendant for violations of the Fourteenth Amendment and negligence under the New Mexico Tort Claims

2

Act.[1] Pl.'s Compl. 8-13. On February 17, 2017, Defendant moved for summary judgment on Plaintiff's negligence claim. ECF No. 24. Plaintiff responded on February 28, 2017 (ECF No. 25), and Defendant replied on March 13, 2017 (ECF No. 26).

## II. SUMMARY OF ARGUMENTS

Defendant argues that Plaintiff's claim under the New Mexico Tort Claims Act must be dismissed because she did not comply with the statutory requirement concerning written notice. Furthermore, Defendant contends that Plaintiff is unable to establish actual notice by depending solely on the jail's incident report since the report did not alert the County that litigation was likely to ensue against it. Def.'s Mot. 1-6. In response, Plaintiff does not dispute that she did not comply with the statute's 90-day written notice requirement. Instead, she asserts that the jail's internal incident report provided Defendant with actual notice that Plaintiff would bring this lawsuit. Alternatively, Plaintiff argues that the 90-day clock for providing notice was tolled because she was incapacitated as a result of the beating she suffered. Pl.'s Resp. 6-11.

## III. ANALYSIS

Under the New Mexico Tort Claims Act, a claimant ordinarily must submit her claim to the appropriate government official within 90 days of the alleged tort. In pertinent part, the statute governing notice provides:

> A. Every person who claims damages from the state or any local public body under the Tort Claims Act shall cause to be presented to . . . . the county clerk of a county for claims against the county, . . . . *within ninety days after an occurrence* giving rise to a claim for which immunity has been waived under the Tort Claims Act, a written notice stating the time, place and circumstances of the loss or injury.

---

[1] Plaintiff filed a previous suit with similar allegations on July 7, 2014. *See* 2:14-cv-619-KG-WPL. On May 19, 2016, the Court dismissed her § 1983 Fourteenth Amendment due process claims without prejudice because she failed to exhaust her remedies at the Curry County Detention Center. It declined to exercise supplemental jurisdiction over her remaining state law claims. *See* Mem. Op. and Order, ECF No. 75.

3

N.M. STAT. ANN. § 41-4-16 (1977) (emphasis added). The purpose of the notice requirement "is to ensure that the agency allegedly at fault is notified that it may be subject to a lawsuit." *Lopez v. State*, 930 P.2d 146, 149 (N.M. 1996). This notice requirement permits the governmental entity "to protect itself against false or exaggerated claims while also permitting it to identify and settle meritorious claims." *Lopez*, 930 P.2d at 149. If the notice requirement is not met, a court lacks jurisdiction to consider the case. *See* § 41-4-16(B) ("No suit or action for which immunity has been waived under the Tort Claims Act shall be maintained and no court shall have jurisdiction to consider any suit or action against the state or any local public body unless notice has been given as required by this section . . . .").

### A. Exception to the General Rule: Actual Notice

The statute provides both an exception and a tolling provision that are relevant to the instant Motion. First, the written notice requirement is excused in situations where the governmental entity had actual notice. In relevant part, Section 41-4-16 provides:

> B. No suit or action for which immunity has been waived under the Tort Claims Act shall be maintained and no court shall have jurisdiction to consider any suit or action against the state or any local public body unless notice has been given as required by this section, *or unless the governmental entity had actual notice* of the occurrence.

*Id.* (emphasis added).

Whether a state or local government body should be imputed to have received actual notice is a threshold issue to be determined by the trial court. *Lopez*, 930 P.2d at 151. "Because under Section 41-4-16(B) actual notice is a jurisdictional question and separate from the ultimate issue of liability, whether the facts give rise to a reasonable inference that a claim may be filed is a threshold inquiry to be resolved by the court." *Id.* To determine if the governmental entity allegedly at fault had actual notice, New Mexico courts apply the "likelihood that litigation may

4

ensue" standard. *Lopez*, 930 P.2d at 150. Utilizing this standard, courts evaluate whether, "from the totality of the circumstances known to the governmental entity charged with fault in the occurrence, a reasonable person would have concluded that the victim may claim compensation." *Id.* Actual notice of the incident or injury alone is insufficient. Instead, the notice required is "actual notice that there exists a 'likelihood' that litigation may ensue." *Frappier v. Mergler*, 752 P.2d 253, 256 (N.M. Ct. App. 1988).

The New Mexico Supreme Court has held that, under some circumstances, a report such as a police report could fulfill the actual notice requirement of Section 41-4-16(B), "but only where the report contains information which puts the governmental entity allegedly at fault on notice that *there is a claim against it*." *City of Las Cruces v. Garcia*, 690 P.2d 1019, 1021 (N.M. 1984) (emphasis in original). Other cases suggest that the level of detail in a report and the function the report is intended to serve are important factors in deciding whether a government agency had actual notice pursuant to Section 41-4-16(B). For example, in *Frappier*, a plaintiff sued the Village of Corrales and other government officials some two years after she got into a car accident with an officer from the Village police department. *Frappier*, 752 P.2d at 255. Because formal written notice had not been given in accordance with Section 41-4-16(A), the plaintiff instead argued that the Village had actual notice because of the police report completed at the scene of the accident. *Id.* at 255-56. The court of appeals reviewed the plaintiff's claim under the "likelihood that litigation may ensue" standard and held that the police report did not constitute actual notice under the New Mexico Tort Claims Act. *Id.* at 257. The brief report did not indicate that plaintiff was hurt, and in fact identified her as the responsible party for the accident. *Id.* The court held that the mere facts contained in the report were not sufficient to put

5

the Village on notice that there was a likelihood that litigation would ensue against it as a result of the accident. *Id.*

*Lopez* provides another useful example. There, a plaintiff filed a premises liability lawsuit against the Bernalillo County Metropolitan Court and the State of New Mexico after she tripped and injured herself exiting a courtroom. *Lopez*, 930 P.2d at 148. The primary question in the case was whether actual notice was provided under Section 41-4-16(B) by means of the submission of an incident report to the State Risk Management agency, which is charged with "compromising, adjusting, settling, and paying claims." *Id.* As the court of appeals had done in *Frappier*, the New Mexico Supreme Court evaluated plaintiff's claim under the "likelihood that litigation may ensue" standard, but this time concluded that the incident report contained sufficient information to provide actual notice to the governmental entity allegedly at fault. *Id.* The court considered the level of detail in the report, including the date, time, and location of the plaintiff's accident, a list of witnesses, a description of how the accident took place, a detailed description of the condition of the premises, and the types of serious injuries the plaintiff suffered as a result. *Id.* Furthermore, the court thought it of great importance that the incident report was prepared "not merely for statistical purposes," but was instead sent to the Risk Management agency. *Id.* The combination of these factors persuaded the court that a factfinder could reasonably infer that the Metropolitan Court "recognized a likelihood of suit." *Id.* at 151. The court remanded the case with instructions to the trial court to hold an evidentiary hearing on the sole issue of whether these circumstances gave the state government defendant actual notice. *Id.* at 152.

*Callaway v. New Mexico Dept. of Corrections* further illustrates that actual notice requires the governmental body to have more than mere knowledge of the incident in question.

Callaway was severely beaten while in custody at the state penitentiary. *Callaway v. New Mexico Dept. of Corrections*, 875 P.2d 393, 395 (N.M. Ct. App. 1994). He did not provide written notice pursuant to Section 41-4-16(A), and instead contended that the circumstances of his case gave the Corrections Department actual notice under Section 41-4-16(B). *Id.* at 396. The court of appeals remanded the case to the district court with instructions to reconsider whether the following facts combined to put the Department on actual notice: (i) a letter sent two months after the incident by plaintiff's attorney to defendant stating that plaintiff was represented by counsel and requesting an investigation into the incident; (ii) a request one month after the incident by plaintiff's wife for copies of his medical records; (iii) a response from the Governor's office to a letter that plaintiff's wife had sent regarding the incident; and, (iv) the transfer of the letter by the Governor's office to the Secretary of the Department of Corrections with instructions that the Department Secretary "take whatever actions he deems appropriate." *Id.*

The most recent guidance the New Mexico courts have offered on the issue of actual notice under Section 41-4-16(B) is from *Herald v. Board of Regents of University of New Mexico*, 357 P.3d 438 (N.M. Ct. App. 2015). In *Herald*, a medical resident alleged she was raped by a fellow resident in her program. *Herald*, 357 P.3d at 440. After she was terminated from the residency program, she sued the university in part under the New Mexico Tort Claims Act. *Id.* at 441. She claimed that, because she reported the rape to administrators of the residency program, the university had actual notice under Section 41-4-16(B). *Id.* at 449. The court of appeals held that plaintiff's reporting of the rape to school administrators did not fulfill the requirements of actual notice under the statute. *Id.* It reasoned, "[w]ithout such notice, the fact that Plaintiff notified Defendant of the alleged rape does not satisfy Section 41-4-16(B)." *Id.*

7

## B. Defendant Did Not Have Actual Notice Under Section 41-4-16(B)

Applying these principles of law to the facts of the present case, the Court concludes that the incident report of the beating did not give Curry County actual notice that litigation would likely ensue against it. A brief chronology helps to explain why.

First, the parties do not dispute that Plaintiff was beaten by another inmate at the Women's Annex on February 1, 2014. *See* Pl.'s Compl. 3; Def.'s Mot. 2; Pl.'s Resp. 2. This beating was documented in two different reports. In a report prepared the day of the beating, Sergeant Mary Lujan documented the incident as follows:

> On the above date [February 1, 2014] and time [17:22] a 1024 was called at the annex. When I arrived at the annex Kimberly Moore was locked down. She was yelling calling Veronica Galvan a fucken snitch. I advised Moore to calm down. After talking to Officer Burbank at the annex she advised me that Kimberly Moore was the aggressor and she just started punching Veronica Galvan. Burbank said that Galvan did not hit Moore back. I advised Burbank to write a statement on the situation.

Def.'s Mot., Ex. B at 4.

The only evidence submitted to the Court where it appears that Detention Officer Burbank memorialized her observations is an excerpt from the Annex Log Book:

> 2-1-14 Galvan was at the back tables by the tv. Moore went up to her and tried instigating [sic] her. Moore began calling Galvan a snitch and then began punching her. May pushed Moore away from Galvan and I was able to keep Moore away as I attempted to get Moore to her cell. Moore tried resisting as I pulled her to her cell. Officer Eliam was able to assist me in placing Moore into 917. Sgt Lujan moved Moore into 911 on lockdown. She was taken to PRMC to get her hand & arm checked out per medical. Statements, move slips & write ups have already been done. S2 moved Rodriguez, M to 901, and May, Brittany to 02A. SO Slate came in and spoke with Galvan and myself and also collected my statement. Pictures where [sic] taken of Moore's arm and hand. Galvan refused photo documentation.

Pl.'s Resp., Exh. 3.

The final component of the chronology occurred when Plaintiff sent notice of her tort claim to the Curry County Clerk on May 20, 2014, one hundred and eight (108) days after the beating. *See* Def.'s Mot. 2; Pl.'s Resp. 2.

Recognizing that the written notice she submitted on May 20, 2014, fell outside the 90-day requirement in Section 41-4-16(A), Plaintiff argues that the County had actual knowledge pursuant to Section 41-4-16(B) because the incident was recorded on camera and an internal incident report was completed. Pl.'s Resp. 7-8. In support of this argument, Plaintiff provides an affidavit from Gerry Billy, a former Curry County Detention Administrator, which states in part: "Based on my own personal knowledge and experience with the Curry County Detention Center, the incident reports such as Exhibit 1 are prepared by the Curry County Detention Center in anticipation and under the understanding that a subsequent civil law-suit [sic] may be filed against the County Commission." Pl.'s Resp., Ex. 2 at 2. According to his affidavit, Mr. Billy was the Curry County Detention Administrator for less than one year, with his service ending more than a year before the incident before the Court. *Id.* at 1.

The Court has struggled to give any credit to Mr. Billy's affidavit because his assertions are conclusory, temporally irrelevant, bereft of any specific factual support showing that he was aware of how incident reports were being prepared or used more than a year after his departure, and otherwise contrary to common sense. It simply cannot be that *every* incident report prepared in a busy and modern county detention facility automatically puts the detention center administrator, county manager, or county commission on notice that *the county* itself might be sued. The Court can reasonably imagine any number of reasons why personnel at a detention center would generate an incident report – most having to do with inmate misconduct or inmate discipline – with only a tiny percentage of those reports reasonably suggesting the potential of

9

civil liability on the part of the county. The Court has considered Mr. Billy's affidavit and has given it the weight it is due, but does not adopt or accept his implicit assertion that *every* incident report prepared for any reason at the Curry County Detention Center as a matter of law puts the Curry County Commission on notice that it or its components might someday be sued.[2]

The question for the Court, then, is whether the incident report prepared for *this incident* gave the County notice that it might *itself* be sued. As illustrated by *Frappier*, *Lopez*, *Callaway*, and *Herald*, actual notice of the incident merely having taken place is not sufficient to fulfill the statute's notice requirement. The Court concludes that the incident report relied on by Plaintiff, even as supplemented by Officer Burbank's journal entry, was wholly inadequate to constitute actual notice under the New Mexico Tort Claims Act. No credible evidence suggests that the incident report was completed out of concern that a lawsuit against the jail might arise. Although the Women's Annex was clearly aware that an inmate-on-inmate assault took place, the descriptive language in the report was brief. The report noted that Plaintiff was punched by Ms. Moore but made no mention that serious injuries incurred. Furthermore, the report did not indicate that any action by the guards or any other detention center personnel led to the incident or contributed in any way to Plaintiff's injuries. Similar to the report prepared in *Frappier*, the jail's report contained no information that reasonably would have led the administrators of the Women's Annex (nor any other county officials) to believe litigation against the jail may ensue as a result.

It is plainly apparent to the Court that the report was completed to justify discipline for the aggressor, to document the need to house the combatants separately in the future, and to summarize the key facts and potential witnesses for possible criminal investigation and

---

[2] Under *Lopez*, the responsibility for deciding whether a defendant has received actual notice under § 41-4-16(B) and for resolving any factual questions associated with that question belongs to the Court. 930 P.2d at 151. In its discretion, the Court determines that no evidentiary hearing was necessary to resolve the question of actual notice.

prosecution of the aggressor. That there is no evidence that the report was forwarded to the county clerk, county manager, nor county attorney is another strong indicator that the report was not intended to (and did not) alert the County to the likelihood that litigation against it would ensue.

Moreover, the compelling factors present in *Lopez* and *Callaway* that led the New Mexico appellate courts to conclude that a trial court should hold an evidentiary hearing to determine whether the state government had actual notice are simply not present in this case. Unlike the report in *Lopez*, the incident report here was never sent to any county administrator or any agency responsible for investigating and resolving claims. County officials were not provided jail incident reports as a matter of course and instead, the reports "were for internal Detention Center purposes." Def.'s Reply, Ex. D at 2. Nor was there any evidence submitted in this case, as there was in *Callaway*, that any attorney for or family member of Plaintiff attempted to intercede on her behalf as a consequence of the beating she suffered. The evidence instead shows that the first notice that Defendant received that it might itself be sued came in the form of Plaintiff's counsel's May 20, 2014 tort claim notice. Because Plaintiff offers no credible evidence to the contrary, the Court cannot make a reasonable inference that the Defendant had actual notice of Plaintiff's claim against it.

### C. Statutory Tolling Based on "Incapacitation"

Alternatively, Plaintiff argues that the 90-day time for giving notice of her tort claim was tolled because she was "incapacitated" from February 1, 2014, through May 19, 2014, the date on which she hired counsel. Pl.'s Resp. 10. In support of this theory, Plaintiff relies on three paragraphs from her own affidavit, in which she states:

> After the severe beating I received on February 1, 2014, I was in a severe mental daze from among other things severe continuous debilitating headaches, physical

11

> pain, and incapacitating terror of being re-assaulted by Kimberly Moore until at least May 19, 2014.
>
> I was physically and mentally incapacitated from taking any action to hire an attorney or get a Tort Claim Notice filed regarding the February 1, 2014 beating. The beating severely affected me, disoriented me and made me incapacitated from taking action to protect my legal interests.
>
> I was not able to hire an attorney or file a Tort Claim notice until at least May 19, 2014 because of my physical and mental incapacity caused by the February 1, 2014 severe beating.

Pl.'s Resp., Ex. 1 at 5-6. Defendant argues that Plaintiff's affidavit is a "sham" and it should be disregarded by the Court, since the affidavit is clearly at odds with her earlier deposition testimony. Def.'s Reply 8.

Under Section 41-4-16(B), an additional period of up to 90 days is allowed for persons who are incapacitated from giving notice due to injury. § 41-4-16(B) ("The time for giving notice does not include the time, not exceeding ninety days, during which the injured person is incapacitated from giving the notice *by reason of injury*.") (emphasis added). The statute does not define "incapacitated." Furthermore, so far as this Court is aware, New Mexico courts have yet to provide guidance on the meaning of "incapacitation" as used in § 41-4-16(B) or the standard by which it should be measured.

To determine the most natural meaning of the term "incapacitated," the Court consulted commonly-used dictionaries. Black's Law Dictionary defines "incapacitated person" as "[s]omeone who is impaired by an intoxicant, by mental illness or deficiency, or by physical illness or disability to the extent that personal decision-making is impossible." *Incapacitated Person,* BLACK'S LAW DICTIONARY (10th ed. 2014). It further defines "legally incapacitated person" as "[a] person, other than a minor, who is temporarily or permanently impaired by mental illness, mental deficiency, physical illness or disability, or alcohol or drug use to the

extent that the person lacks sufficient understanding to make or communicate responsible personal decisions or to enter into contracts." *Legally Incapacitated Person,* BLACK'S LAW DICTIONARY (10th ed. 2014). More generically, Merriam-Webster defines "incapacitate" as "to make legally incapable or ineligible" and "to deprive of capacity or natural power." *Incapacitate*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/incapacitated (last visited May 26, 2017). Giving this term its natural meaning within the context of the statutory language that surrounds it, the Court concludes that "incapacitated" as used in § 41-4-16(B) means "without capacity to act," "incapable of acting," or "powerless to act."

Having defined incapacitation as the term is used in § 41-4-16(B), the Court must now decide through what legal means the existence of incapacitation is measured. The New Mexico Supreme Court's decision in *Lopez* is of immediate help in this inquiry. In *Lopez*, the court emphasized that the related issue of actual notice under Section 41-4-16(B) is "a jurisdictional question and separate from the ultimate issue of liability." *Lopez*, 930 P.2d at 151. For that reason, the question of whether a governmental body had actual notice is "certainly one worthy of an evidentiary hearing for the court to determine." *Id.* Although *Lopez* dealt with the separate question of actual notice, this Court is convinced that a similar evidentiary hearing is likewise the appropriate vehicle for resolving any fact questions associated with the closely-related statutory tolling provision for a claimant's alleged incapacitation.[3]

To resolve any lingering fact questions associated with whether Plaintiff was "incapacitated" as set forth in Section 41-4-16(B), the Court held an evidentiary hearing on May 11, 2017. The evidence presented at the hearing was limited to the issue of whether Plaintiff was incapacitated by injury pursuant to Section 41-4-16(B). *See* Order Setting Hearing, ECF No. 32.

---

[3] At the outset of the evidentiary hearing, the Court announced its legal conclusions concerning the issue of incapacitation being one to be decided by the Court and the Plaintiff bearing the burden to prove her incapacitation by a preponderance of the evidence. Neither party objected to either conclusion or the hearing held that day.

13

Having considered Plaintiff's testimony at the hearing, the rest of the documentary evidence submitted by the parties in connection with their briefing, and the total of ten exhibits the parties introduced during the hearing, the Court now makes the following factual findings:[4]

1. Plaintiff was booked into the Curry County Detention Center "Women's Annex" in Clovis, New Mexico on January 21, 2014, and was incarcerated at the facility from January 21, 2014, through May 30, 2014, whereupon she was then transferred to a Department of Corrections facility in Grants, New Mexico. Plaintiff's incarceration was pursuant to a six-month sentence imposed by a district judge in the Ninth Judicial District.

2. Plaintiff had been incarcerated in the Women's Annex three or four times before, including one stay that lasted approximately six months. Consequently, she was aware of jail policies and procedures, how inmates make requests of jail staff, how inmates get jobs inside the jail, and other aspects of jail life.

3. On February 1, 2014, Plaintiff endured a beating by a fellow inmate named Kimberly Moore. *See, e.g.,* Pl.'s Ex. 1 (security footage of incident). The security footage of the incident depicts Plaintiff sitting at a table in the dayroom when Moore approached her and, without any apparent provocation, suddenly began to repeatedly punch and kick Plaintiff in her upper torso and head. Although the beating lasted only approximately 23 seconds, Moore appears to have punched Plaintiff at least 17 times, pulled Plaintiff to the ground, and then kicked her at least five times. Plaintiff remained in a defensive posture throughout the beating and did not fight back.

4. Plaintiff was evaluated immediately after the beating by a medical staffer at the jail whose first name is Guy. He shined a light in her eyes and asked her how she was feeling. She

---

[4] Because no finalized transcript has been prepared, this opinion does not cite to one. Furthermore, the findings set forth herein are only those necessary to resolve the instant Motion. Finally, any conflict between Plaintiff's testimony and her affidavit have been resolved consistent with the findings set forth herein.

was not transported to a hospital or a separate medical facility. She needed neither stitches nor staples, nor was she ever diagnosed with a concussion.

5. As a result of the beating, Plaintiff suffered bruises and lumps on her head that took anywhere from two to four weeks to resolve, the loss of hair that was ripped from her scalp, and relatively constant headaches. She would sometimes experience dizziness and a feeling of being disoriented or light-headed, as well as persistent pain in her neck and right shoulder.

6. Plaintiff only made one request for medical treatment associated with the injuries she suffered during the beating. Pursuant to that request, she was taken to the main building where she saw a medical provider other than Guy and was given ibuprofen for her recurrent headaches. For the remainder of her incarceration at the Women's Annex, a medical officer periodically administered ibuprofen to her.

7. In addition to that one-time request, Plaintiff sent written requests to jail staff for medical conditions unrelated to the beating. *See* Def.'s Exhs. A (April 3, 2014 request to be seen for carpal tunnel condition); B (March 2, 2014 request to be seen for eczema on elbow, as well as a head cold; also requested visit with mental health counselor); C (February 7, 2014 request to be seen for eczema).

8. Plaintiff consulted the mental health counselor at the jail at least once a week during the entirety of the four-month stay that is the subject of this lawsuit.

9. In addition to submitting written requests for medical care, Plaintiff also sent requests for other issues unrelated to medical care. For example, Plaintiff sent a request asking jail staff when the next transport bus to the Grants women's prison was scheduled. Def.'s Exh. D (dated February 1, 2014). She sent another request asking jail staff to arrange to release her property to her daughter because she knew she would not be permitted to take it with her to the prison in

Grants. Def.'s Exh. F (dated February 28, 2014). Plaintiff sent a request asking for a copy of her disposition paperwork from her criminal case. *See* Def.'s Exh. E (dated February 10, 2014). And she sent multiple requests seeking the assistance of jail staff to have her Judgment and Sentence amended to reflect that she was sentenced to county jail, instead of the state's Corrections Department. *See* Def.'s Exhs. G (dated April 15, 2014) and H (dated April 22, 2014). During her testimony, Plaintiff stated that she was seeking the amendment so that she would be credited for "good time" during her stay in the county jail just as she would have been had she been in the Corrections Department's custody.

10. On at least one occasion after the beating, Plaintiff telephoned the state public defender's office in an effort to enlist her attorney's support in getting her Judgment and Sentence amended. A phone in the dayroom of the Women's Annex was set aside for attorney-client calls and was available throughout the day to inmates to use for their convenience.

11. Although Plaintiff did not have money on her books with which to call her children, she would have done so if she had the money. She also periodically received visitors at the jail.

12. Consistent with what she had done in prior stays at the jail, Plaintiff applied for work status during this incarceration. In addition to the possibility of earning good time credit toward her sentence, Plaintiff also worked to keep herself busy and to keep "her mind off things." She performed multiple duties during the entirety of the period of incarceration that is at issue in this case. For example, she was the primary laundry worker for the Women's Annex during the entire period between January 21 – May 30, 2014. This responsibility required several hours five days per week, alternating between laundering inmate clothes, linens, and blankets. She also assisted on a frequent as-needed basis with the distribution of meals to the female inmates. And she was one of three pod porters responsible for cleaning the common areas and restrooms. She

held each of these jobs before the beating and continued to perform them without interruption after the beating. These jobs required Plaintiff to work at least eight hours every day.

13. After the beating, Plaintiff was fearful of another encounter with Moore, who continued to make threats. When Plaintiff was not working at her various jobs, she would sit near where the on-duty detention officer was posted out of concern of being re-attacked by Moore.

14. During her multiple stays at the jail, Plaintiff had developed relationships with various personnel there, including guards, mental health counselors, and administrators. She often directed her inmate request forms to specific individuals because she generally knew each of their responsibilities.

15. Plaintiff was diagnosed with bi-polar disorder in 2011 or 2012, well before she served this period of incarceration. She did not take any medicine for it, however, because she failed to return to the diagnosing doctor to obtain a prescription.

16. In May 2014, Plaintiff was referred to her present attorney, Eric Dixon, Esq., by another inmate who happened to be consulting with Mr. Dixon in the jail on an unrelated case.

17. On or about May 30, 2014, Plaintiff was transferred to the Corrections Department's women's prison in Grants. As a part of her transition at the prison, she was medically screened and cleared for assignment to a housing unit.

On the basis of the foregoing factual findings, the Court concludes that Plaintiff was not "incapacitated" as that phrase is used in § 41-4-16(B). Indeed, although the Court believes that Plaintiff was injured during the fairly brutal beating she endured, the Court is impressed by the capacity that Plaintiff manifested in the days and weeks after the beating. Plaintiff continued to work at all three jail jobs without interruption. She only once requested medical treatment for

beating-related injuries, although she requested unrelated medical treatment at least three other times. She saw a mental health counselor at least once a week throughout her four-month stay. Importantly, Plaintiff demonstrated the capacity to vindicate her legal interests by submitting requests (and at least once calling her public defender) that either would have accelerated her transfer to the Corrections Department (where she would have been entitled to earn good time credit) or would have resulted in an Amended Judgment and Sentence to change her commitment to the county jail instead of the Corrections Department (with a retroactive good time recalculation). And Plaintiff showed the capacity to protect her safety by making the intentional choice to sit close to guards she knew well in the common areas of the jail in an effort to avoid inmate Moore. In sum, the evidence has convinced this Court that Plaintiff is a savvy, knowledgeable, and experienced inmate whose capacity and capabilities were not meaningfully disrupted by the beating she underwent or the injuries stemming from it.

For these reasons, the Court concludes that Plaintiff has not met her burden of demonstrating by a preponderance of the evidence that she was "incapacitated from giving the [Tort Claims] notice by reason of injury," as § 41-4-16(B) requires.

### IV. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Defendant's "Motion for Summary Judgment No. I: Notice Under the New Mexico Tort Claims Act" [ECF No. 24], is **GRANTED**. **IT IS FURTHER ORDERED** that Count 2 of the Complaint is **DISMISSED WITH PREJUDICE FOR LACK OF SUBJECT MATTER JURISDICTION**.

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**