**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

VERONICA GALVAN,

      Plaintiff,

v.                                              Civ. No. 16-535 GJF/KRS

BOARD OF COUNTY
COMMISSIONERS FOR CURRY
COUNTY, NEW MEXICO,

      Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT NO. II

THIS MATTER is before the Court on Defendant's "Motion for Summary Judgment No. II: Summary Judgment for the Board of County Commissioners" ("Motion") [ECF No. 33], filed April 26, 2017. After careful consideration of the pertinent law and the parties' briefing, the Court will grant the Motion and will dismiss Plaintiff's federal civil rights claim (Count I of the Complaint) with prejudice.[1] For the reasons discussed below, the Court concludes that the evidence submitted by Plaintiff has failed to establish a genuine dispute of material fact regarding the existence of any unconstitutional policy or custom by the municipal defendant that caused her injuries. The Court further concludes that Defendant is entitled to judgment as a matter of law as to Count I in its entirety.

## I.    BACKGROUND AND PROCEDURAL HISTORY

This case arises out of Plaintiff's incarceration at the Curry County Detention Center ("CCDC") "Women's Annex" in Clovis, New Mexico. Pl.'s Compl. ¶ 6, ECF No. 1. Plaintiff was incarcerated there as a sentenced state prisoner from January 21, 2014, through May 30, 2014, when she was transferred to another facility. *Id.* ¶ 8. Plaintiff alleges that she was battered

---

[1] The Court previously dismissed with prejudice Count II of the complaint, which alleged negligence under the New Mexico Tort Claims Act. *See* Mem. Op. and Order, ECF No. 44.

by another inmate on February 1, 2014, during which she sustained a broken hand, scratches on her face, and bruising on her head, knee, and face. *Id.* ¶¶ 10, 15. Plaintiff contends that her injuries stemmed from Defendant Curry County Board of Commissioners' (hereafter "Board's" or "Defendant's") multiple policy failures,[2] all of which combined to violate her Fourteenth Amendment due process rights, including: failing to properly classify and segregate violent inmates, failing to adequately train and supervise detention officers, failing to provide proper medical care for inmates, failing to prevent overcrowding of the Women's Annex, failing to adequately staff and fund operations at the Women's Annex, and failing to provide a safe and humane physical plant at the Women's Annex. *Id.* ¶¶ 40, 46-55.

On April 26, 2017, Defendant moved for summary judgment on Plaintiff's Fourteenth Amendment claim. ECF No. 33. Plaintiff responded on May 18, 2017 [ECF No. 41], and Defendant replied on June 1, 2017. ECF No. 46.

## II.  SUMMARY OF ARGUMENTS

Defendant argues that Plaintiff's claims under the Fourteenth Amendment must be dismissed because "there simply is not any evidence that a municipal policy, practice or custom caused a violation of Plaintiff's Due Process rights, or that the Board was deliberately indifferent." Def.'s Mot. 12, ECF No. 33. It emphasizes that there was a policy in place at CCDC for classifying and segregating violent inmates, both at the booking stage and at any other point when detention personnel become aware of a problem between inmates. *Id.* at 8. The Board also contends that there is no evidence that any allegedly deficient policy or custom caused Plaintiff's injuries. Defendant asserts that Plaintiff's injuries arose solely out of a personal dispute between two inmates, as opposed to any policy or custom attributable to the

---

[2] Unlike the vast majority of plaintiffs in civil rights cases, Plaintiff chose to sue only the Curry County Board of Commissioners. She named no individual defendants.

Board as a municipal entity. Defendant also argues that Plaintiff's criticism of the medical care provided to inmates at CCDC is irrelevant because she does not allege that she herself was denied care. Defendant also characterizes Plaintiff's allegations of insufficient staffing, overcrowding, lack of training and supervision, inadequate facilities, and improper funding as either irrelevant or baseless. *Id.* at 8-13.

Plaintiff responds that the severe beating she experienced was "totally preventable" by Defendant. Pl.'s Resp. 15, ECF No. 41. She insists that inmate Moore was "known to be an aggressive, dangerous inmate that should have been segregated and kept away from the general population." *Id.* at 16. She further asserts that Defendant failed in its duty to "adequately screen detainees for violence, adequately staff the facility and prevent violence." *Id.* at 17-18. Plaintiff also alleges that the Board tolerated a policy or custom of failing to provide adequate medical care to inmates, primarily by imposing a $10 fee before any treatment would be rendered. *Id.* at 18-19. Plaintiff concludes by criticizing the Board for understaffing the Women's Annex and failing to update its antiquated logbook to a computerized system, all of which caused Plaintiff to be beaten. *Id.* at 19.

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The entry of summary judgment is mandated "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party who will bear the burden of proof at trial on a dispositive issue must designate specific facts showing that there is a genuine issue for trial. *Id.* at 324. In order for an issue to be genuine, the evidence of it must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If there is not sufficient evidence favoring the nonmoving party, there is no issue for trial. *Id.* at 249. Furthermore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1986)) (internal quotation marks omitted).

At the summary judgment stage, "a plaintiff's version of the facts must find support in the record." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). As with any fact asserted by a party in a summary judgment motion, the non-movant must point the Court to such support by "citing to particular parts of materials in the record[.]" Fed. R. Civ. P. 56(c)(1)(A). All material facts set forth in the motion and response that are not specifically controverted are deemed undisputed. D.N.M.LR-Civ. 56.1(b).

Because the Court decides motions for summary judgment by viewing the facts in the light most favorable to the non-moving party, the Court obeys three general principles. First, the Court's role is not to weigh the evidence, but only to assess the threshold issue of whether a genuine issue exists as to material facts such that a trial is required. *See Liberty Lobby*, 477 U.S. at 249. "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citation omitted). Second, the Court must resolve all

reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party. *See Hunt v. Cromartie*, 526 U.S. 541, 550-55 (1999). Third, the Court cannot decide any issues of credibility. *See Liberty Lobby*, 477 U.S. at 255. "[T]o survive the . . . motion, [the non-movant] need only present evidence from which a jury might return a verdict in his favor." *Id.* at 257. Nonetheless, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]" *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## IV.    LEGAL STANDARD FOR MUNICIPAL LIABILITY CLAIMS

42 U.S.C. § 1983 provides remedies for persons who have been deprived of their constitutional rights under color of state law. In pertinent part, the statute provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (2012). Though the statute expressly creates a cause of action against "persons" who act under the color of state law to violate rights of others, the Supreme Court has held that municipalities and local governments may also be sued under § 1983. *See Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978) ("[L]ocal governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' . . . .").

Municipalities and local governments cannot be sued on a respondeat superior theory alone, however, meaning that they cannot be held liable on the sole basis that they employed a

tortfeasor.  *Id.* at 691.  Instead, they can only be sued "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 694.  The Supreme Court has made clear that this requirement "was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original).  A municipality is therefore only responsible for acts that it "officially sanctioned or ordered."  *Id.* at 480.

Municipal liability under § 1983 attaches only where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  *Id.* at 483.  In the Tenth Circuit, a municipal policy or custom can take the following forms:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation marks and citations omitted).

Merely establishing the existence of a policy, however, does not by itself create municipal liability.  *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).  "[A] plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was

the 'moving force' behind the injury alleged." *Id.* (emphasis in original). To prove this, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* The Tenth Circuit has emphasized that "[t]he causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 770 (10th Cir. 2013) (citation omitted).

When a municipality is sued for failure to adequately train its officers, liability attaches "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact," and that deliberate indifference was the moving force behind the violation of the plaintiff's federally protected right. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). The plaintiff must demonstrate specific training deficiencies and either (1) a pattern of constitutional violations of which policy-making officials can be charged with knowledge, or (2) that training is obviously necessary to avoid constitutional violations. *Id.* at 390; *see also Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998). The plaintiff must identify a particular deficiency in the training program and then prove that the identified deficiency was the actual cause of the plaintiff's constitutional injury. *City of Canton*, 489 U.S. at 390-91.[3]

Moreover, a "pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train[.]" *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (internal quotation marks and citation

---

[3] Allegations that a municipality failed to adequately supervise its officers are evaluated under a deliberate indifference standard identical to that employed for claims alleging failure to train. *See, e.g., Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1240 (10th Cir. 1999).

omitted). In the specific context of the training of jail guards, "[i]t is not enough . . . to show that there were general deficiencies in the county's training program for jailers. Rather, [the plaintiff] must identify a *specific deficiency* in the county's training program closely related to his ultimate injury, and must prove that the deficiency in training actually caused his jailer to act with deliberate indifference to [the plaintiff's] safety." *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999) (citing *City of Canton*, 489 U.S. at 391) (emphasis added).

## V.    UNDISPUTED FACTS

The Court divides this section into two parts:  (1) facts that the parties have expressly agreed are undisputed, and (2) facts submitted by Defendant that the Court has found to be undisputed despite Plaintiff's argument to the contrary.

### A.    Stipulated Undisputed Facts

Of the forty-two (42) material facts that Defendant enumerated in its Motion [Def.'s Mot. 2-7], Plaintiff admitted twenty-three (23) of them in her Response.  Pl.'s Resp. 2.  The Court will therefore treat the following as undisputed material facts:[4]

1.    Plaintiff was arrested and booked into the Curry County Adult Detention Center on January 21, 2014.

3.    Plaintiff was playing cards in the evening and another inmate named Mary Jane Aragon told Plaintiff that inmate Moore wanted to meet her in the shower area, because there were no cameras back there.

4.    At the time, Plaintiff was playing cards in the dayroom with some other inmates and listening to her headphones.

5.    At the time, the Detention Officer on duty, Raedean Burbank, was not on the floor.

---

[4] The Court uses the paragraph numbering and lettering schemes used by the parties in their briefing.

6.   Plaintiff responded to inmate Aragon by telling her that she did not have any time "for that," which indicated that she was not going to go.

7.   A short time later, inmate Moore came into the dayroom and confronted Plaintiff. Inmate Moore then grabbed Plaintiff's hair and started hitting and kicking Plaintiff.

10.   Plaintiff testified that, prior to the fight taking place, she had told various officers at the Detention Center that Ms. Moore was threatening to "mess her up."

11.   Plaintiff claims that, on the first day of her incarceration, she told Detention Center staff that she did not want to be held in the "freeway," which is an open area in the Women's Annex. Plaintiff claimed she was concerned about issues with inmate Moore, and asked to be moved to a cell.

12.   The Detention Center honored Plaintiff's request, and Plaintiff was moved to a cell.

13.   For the entire time period from January 21, 2014 to February 1, 2014, inmate Moore was held in the "freeway."

14.   Plaintiff testified that she told Detention staff that she was concerned because of her relationship with the Perez family and inmate Moore's relationship with the Guerra family.

15.   According to Plaintiff, inmate Moore is married to Louis Guerra, who is serving a sentence for killing Daniel Perez.

16.   Plaintiff's daughter has a child with the Perez family.

17.   Plaintiff was present when Daniel Perez was killed and Plaintiff gave a statement to the police during the investigation of Daniel Perez's murder.

18.   Plaintiff also testified that inmate Moore was referring to her as a "snitch."

20.     On two occasions prior to the fight, Officer Burbank documented issues between inmate Moore and Plaintiff in the Annex Log Book, which is a means of communicating issues from one shift to the next.

25.     Plaintiff testified that she was not offered protective custody but that she was aware of it, and that she would not go because it would worsen her anxiety.

27.     The Detention Center also has contracts to house inmates out-of-county.  The County has such contracts with Roosevelt County, New Mexico, and Bailey and Parmer Counties in Texas.

29.     According to Detention Center policy, Officer Burbank should have notified a supervisor about any issues between Plaintiff and inmate Moore.

31.     The policy was that the supervisor thereafter would investigate the issues and, if necessary, separate the individuals, or send one out-of-county.

34.     The Administrator is responsible for operating the Detention Center.

38.     Detention Officers at Curry County received a one hundred and fifty-six (156) hour Adult Detention training course, which included training on the law, policies and procedures, defensive tactics, inmate discipline, security, classification, among other topics.  As well, officers received on-the-job training and at least forty (40) hours of annual training or re-training.

41.     Plaintiff was sentenced on January 21, 2014, but was still being held in the Curry County Detention Center on February 1, 2014.

**B.     Defendant's Additional Alleged Undisputed Facts**

2.     Plaintiff disagrees with Defendant's assertion that "[o]n February 1, 2014, Plaintiff was involved in a fight with another inmate named Kimberly Moore."  Def.'s Mot. 2. Instead, Plaintiff characterizes the altercation as one in which she "sustained serious injuries as a result of being beaten by another inmate identified as Kimberly Lee Moore[.]"  Pl.'s Resp. 2.

Because for the purposes of resolving this motion it is not necessary to resolve whether the altercation resulted in serious injuries, the Court will find that it is undisputed that "on February 1, 2014, Plaintiff was beaten by another inmate named Kimberly Moore."

8.      Although Plaintiff did not include Defendant's Material Fact 8 in the list of those she admitted, she did not specifically object to this fact in her Response.  Consequently, the Court will find as an undisputed fact that "[a]ccording to the video surveillance, [Officer] Burbank responded to the fight in approximately twenty-four (24) seconds."  Def.'s Mot. 2 (record citation omitted).[5]

9.      Although Plaintiff did not include Defendant's Material Fact 9 in the list of those she admitted, she did not specifically object to this fact in her Response.  Consequently, the Court will find as an undisputed fact that "[a]t the time, [Officer] Burbank was the Detention Officer staffing the Women's Annex.  She heard the fight and responded from the 'cage.'  After seeing and hearing the fight beginning, she had to exit the 'cage,' re-secure it, and then run to the fight."  *Id.* at 2-3 (record citation omitted).

19.      Plaintiff admits the first of three sentences in Defendant's Material Fact 19.  Accordingly, the Court will find as an undisputed fact that "[p]rior to the February 1, 2014 fight, Plaintiff claims she told four (4) Detention Officers about the relative relationships between herself and Ms. Moore."  Def.'s Mot. 3; *see also* Pl.'s Resp. 2 (admitting first sentence of Material Fact 19).  The Court will further conclude that the second sentence of Material Fact 19

---

[5]  The Court may consider a fact to be undisputed if a party "fails to properly address another party's assertion of fact as required by Rule 56(c)[.]"  FED. R. CIV. P. 56(e)(2).  All material facts set forth in the motion that are not specifically controverted by the record designations cited by the non-movant are deemed undisputed.  D.N.M.LR-Civ. 56.1(b).  These are the legal authorities on which the Court relies in this decision any time it finds a fact to be undisputed despite either party's objection to the contrary.

– that the four officers that Plaintiff claims she told this to were Officers Grabowsky, Burbank, Elliott, and "Tabetha" – is also undisputed.[6]

21.      Although Plaintiff asserts that Material Fact 21 is in dispute, the evidence she has designated does not actually controvert this fact. All that this Material Fact asserts is what *Officer Burbank* was told; nothing in Plaintiff's designated facts calls into question Officer Burbank's knowledge about the source of the trouble between Plaintiff and Moore. Consequently, the Court will find as an undisputed material fact that "[a]ccording to [Officer] Burbank, both Plaintiff and Ms. Moore had stated that their problems related to some issues from the street, but that they never went into detail as to what these issues were." Def.'s Mot. 4 (record citation omitted).

22.      Although Plaintiff asserts that Material Fact 22 is in dispute, the evidence she has designated does not actually controvert this fact. The evidence designated by Plaintiff does not refute Officer Burbank's testimony that she "was not aware that Ms. Moore was the wife of Louis Guerra" or that she "did not even know who Louis Guerra was" or that she "did not determine whether Plaintiff had any affiliation with the Guerra family." *Id.* (record citations omitted). Consequently, the Court will find the three sub-facts contained within Material Fact 22 to be undisputed.[7]

26.      Although Plaintiff asserts that Material Fact 26 is in dispute, the evidence she has designated does not actually controvert this fact. To be sure, Plaintiff's designated evidence criticizes the facility, as well as its layout and staffing, but nothing in her evidence in any way refutes the fact that "[t]he Detention Center could offer protective custody to female inmates in

---

[6] The Court concludes that there is a fact issue as to the third sentence but, for reasons explained *infra*, this dispute is not material.

[7] The Court concludes that there are fact issues as to Defendant's Material Facts 23 and 24 but, for reasons explained *infra*, these disputes are not material.

the Annex or in holding."  *Id.* at 5 (record citation omitted).  Consequently, the Court will find Material Fact 26 to be undisputed.

28.     Although Plaintiff asserts that Material Fact 28 is in dispute, the evidence she has designated does not actually controvert this fact.  Nothing in Plaintiff's designated evidence refutes Ms. Sandoval's testimony that she "was not aware of the issues between Plaintiff and Ms. Moore until *after* receipt of the Tort Claim."  *Id.* (record citation omitted).  Consequently, the Court will find Material Fact 28 to be undisputed.

30.     Although Plaintiff asserts that Material Fact 30 is in dispute, the evidence she has designated does not actually controvert this fact.  Consequently, the Court will find as undisputed material facts that "[Officer] Burbank testified that she informed her supervisor about Ms. Moore, but she cannot remember who that person was" and that "[Officer] Burbank never suggested that Ms. Moore be held outside the county because the previous incidents [between her and Plaintiff] were just verbal."  *Id.* (record citation omitted).

32.     Although Plaintiff asserts that Material Fact 32 is in dispute, the evidence she has designated does not actually controvert this fact.  Consequently, the Court will find as an undisputed material fact that "[i]t is not the policy of the Detention Center to ignore inmate complaints."  *Id.* (record citation omitted).

33.     Although Plaintiff asserts that Material Fact 33 is in dispute, the evidence she has designated does not actually controvert this fact.  Consequently, the Court will find as an undisputed material fact that "Ms. Sandoval was not aware that Plaintiff had notified officers of her issues with Ms. Moore."  *Id.* (record citation omitted).

35.     Although Plaintiff asserts that Material Fact 35 is in dispute, the evidence she has designated does not actually controvert this fact.  Nothing in Plaintiff's designated evidence calls

into question the female inmate population at the Detention Center on February 1, 2014, or the capacity of that facility to house female inmates. Whether there were sufficient detention officers to service such a population is a different question, and one beyond the scope of Material Fact 35. Consequently, the Court will find as undisputed material facts that "[t]he Women's Annex at the Curry County Adult Detention Center has fifty-two (52) beds" and "[a]t the time of the February 1, 2014 incident, there were forty-three (43) females held in the Annex." *Id.* at 6 (record citation omitted).

36. Although Plaintiff asserts that Material Fact 36 is in dispute, the evidence she has designated does not actually controvert this fact. Consequently, the Court will find as an undisputed material fact that "[r]ather than maintain a presence in her cell, Plaintiff volunteered for laundry, kitchen and POD porter duties, which necessitated time out of her cell, including serving dinner trays to Ms. Moore." *Id.* (record citation omitted).

37. Although Plaintiff asserts that Material Fact 37 is in dispute, there is no meaningful difference between the evidence submitted by the parties. *Compare* Def.'s Mot. 6 (Officer Burbank undergoing a "month's worth of training") to Pl.'s Resp. 8 (Officer Burbank undergoing "about 88 hours of training"). Consequently, the Court will find as an undisputed material fact that Officer Burbank underwent approximately 88 hours of training over the course of approximately one month after being hired as a detention officer.

39. Although Plaintiff asserts that Material Fact 39 is in dispute, the evidence she has designated does not actually controvert this fact. Nothing in Plaintiff's designated evidence calls into question that medical personnel saw Plaintiff immediately after she was beaten by Moore. Indeed, the best evidence of this fact is the video from the surveillance camera that captured the beating. *See* Def.'s Mot., Ex. B. The video depicts that the beating ceased at 5:21:41. Just more

than two minutes later, at 5:23:50, a male carrying a medical equipment bag approached Plaintiff and used a flashlight to examine her head, face, and eyes. Consequently, the Court will find as undisputed material facts that (a) the Detention Center contracts out the medical care of inmates and that (b) approximately two minutes and nine seconds after the conclusion of the beating, Plaintiff was seen by a male carrying a medical equipment bag and who used a flashlight to examine Plaintiff's head, face, and eyes.

40. Material Fact 40 has two components: (a) Plaintiff was seen by medical personnel for a host of conditions unrelated to any injuries she may have suffered as a result of the beating, and (b) Plaintiff never complained to the medical provider of injury associated with the beating. Def.'s Mot. 6. As to the first component, nothing in Plaintiff's designated evidence calls into question that she was treated for a host of conditions unrelated to the injuries she may have suffered as a result of the beating.[8] As to the second component, however, there is evidence in the record that controverts Defendant's assertion that Plaintiff never complained of injury associated with the beating. As the Court found in its order granting the earlier motion for summary judgment:

> Plaintiff only made one request for medical treatment associated with the injuries she suffered during the beating. Pursuant to that request, she was taken to the main building where she saw a medical provider [ ] and was given ibuprofen for her recurrent headaches. For the remainder of [Plaintiff's] incarceration at the Women's Annex, a medical provider periodically administered ibuprofen to her.

Mem. Op. and Order 15, ECF No. 44.[9]

---

[8] Much of this evidence was introduced by Defendant without any objection by Plaintiff at the hearing on Defendant's "Motion for Summary Judgment No. I: Notice Under the New Mexico Tort Claims Act." ECF No. 24. The Court chronicled this evidence in its Memorandum Opinion and Order granting the motion. *See* Mem. Op. and Order 15 (listing Plaintiff's requests to be seen for carpal tunnel, eczema, head cold, and mental health).

[9] Although the Court will find only the first component of Material Fact 40 to be undisputed, the Court concludes for the reasons explained *infra* that any lingering factual dispute over the second component is not material.

42.     Although Plaintiff asserts that Material Fact 42 is in dispute, the evidence she has designated does not actually controvert this fact.  This material fact asserts three aspects of the booking process at the Detention Center that are designed to identify potential enemies of new inmates:  (a) during booking, the inmate is asked about possible enemies, (b) a "red tag" system is in place to prevent mixing inmates who may have disputes, including the members of the two families in question in this case, and (c) booking officers also are taught to ask about family relationships at the time of booking, provided that information is available to demonstrate a possible connection, including last names or information from the investigating officer or the District Attorney's office.  Def.'s Mot. 7.  This material fact asserts how the process is *designed* to work, not how it *actually* worked in this case.  In contrast, Plaintiff's designated evidence either is non-responsive (for example, the references about an inmate handbook, written grievances, and whether inmate Moore was known to be dangerous) or responds only to how the booking process actually worked in this case, as opposed to how it was designed.  Consequently, the Court will find as undisputed material facts each of the three aspects of the booking process described above.[10]

## VI.     ANALYSIS

Applying the governing principles of law to the undisputed material facts of this case, the Court concludes that Plaintiff's evidence is insufficient to establish that any single policy or custom by the lone municipal defendant violated Plaintiff's Fourteenth Amendment rights.  By choosing to sue only the Board, Plaintiff shouldered the difficult burden that a civil rights

---

[10]   The Court considers two other facts to be undisputed, these arising in the "Additional Material Issues of Fact" portion of Plaintiff's Response.  In her response, Plaintiff enumerated a total of thirty-one (31) additional facts that she alleges are material to her claims.  *See* Pl.'s Resp. 9-14, ECF No. 41.  In its Reply, Defendant took issue with all but two.  *See* Def.'s Reply, 4-7, ECF No. 46 (implicitly conceding the existence of Plaintiff's additional material fact "K" by not responding to it and "BB" by asserting only that it is a question of law).  The Court will thus consider as undisputed that the Annex logbook is kept by the CCDC Administrator in the ordinary course of business and that the Curry County Commission had a classification process in effect that was supposed to evaluate an inmate's history of assaultive behavior.

claimant must meet to trigger municipal liability. In the end, the evidence she has submitted has fallen well short of the quantum necessary for her to be entitled to a trial on this claim.

For its analysis, the Court has divided into three categories the series of CCDC policies or practices that Plaintiff has alleged in support of her Fourteenth Amendment claim: (1) failure to protect her from harm, (2) failure to render appropriate medical treatment for her injuries, and (3) the remaining alleged policies or practices that Plaintiff charged in her complaint, including failure to train and supervise detention officers, failure to prevent overcrowding, failure to adequately staff and fund jail operations, and failure to provide an appropriate physical facility in terms of design, ventilation, roofing, and hygiene.

### A.    Failure to Protect Plaintiff from Violent or Dangerous Inmates

It has long been the law that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (alteration in original) (citation omitted). "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 834 (internal quotation marks and citation omitted). But "not . . . every injury suffered by one prisoner at the hands of another . . . translate[s] into constitutional liability for prison officials responsible for the victim's safety." *Id.* Rather, "[t]o establish a cognizable Eighth Amendment claim for failure to protect, the plaintiff must show that [she] is incarcerated under conditions posing a substantial risk of serious harm[,] the objective component, and that the prison official was deliberately indifferent to [her] safety, the subjective component." *Verdencia v. Adams*, 327 F.3d 1171, 1175 (10th Cir. 2003) (internal quotation marks and citation omitted).

For its part, "deliberate indifference describes a state of mind more blameworthy than negligence." *Farmer*, 511 U.S. at 835. It is not enough for constitutional liability to attach that

an official "fail[ed] to alleviate a significant risk that he should have perceived but did not[.]" *Id.* at 838. That shortcoming, "while no cause for commendation, cannot . . . be condemned as the infliction of punishment" under the Eighth Amendment. *Id.* Instead, deliberate indifference requires a plaintiff to prove that "a prison official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*." *Verdencia*, 327 F.3d at 1175 (internal quotation marks and citation omitted) (emphasis added).

Without question, the predominant theme of Plaintiff's Fourteenth Amendment claim is that CCDC failed to protect her from an inmate who its personnel either knew or should have known was violent and dangerous. In so many words, Plaintiff asserts that CCDC had a practice of either intentionally, or in a deliberately indifferent manner, housing inmates together who had known problems with one another, thereby placing them in a dangerous living situation. Plaintiff alleges that CCDC observed or at least tolerated a policy or custom of failing to properly classify and segregate inmates based on their propensity to engage in violent behavior. With respect to her own particular situation, she contends that CCDC knew or should have known about the specific issues between her and inmate Moore, and CCDC then should have taken steps to separate and protect her from Moore. Plaintiff argues that the failure of the CCDC administration and supervisory staff to house her in an environment reasonably free from assault by violent inmates manifested deliberate indifference to her safety and that of other inmates. *See* Pl.'s Compl. ¶ 38.

But the undisputed facts now before the Court paint a different picture. To begin, the Court has found it undisputed that CCDC *did have* policies for addressing classification and

segregation of violent inmates. These policies applied both at booking[11] and also at any other time when CCDC personnel developed knowledge that a problem existed.[12] If an issue arose between an inmate and any other inmate after the initial housing assignment, CCDC observed a policy that required the on-duty detention officer to memorialize the issue in the Annex logbook and also to notify his/her supervisor. The policy then required the supervisor to initiate an investigation and, if necessary, order the inmates separated. The undisputed facts further demonstrate that CCDC had multiple housing options to consider in defusing and mitigating potential conflict between inmates. These options included offering the threatened inmate protective custody either in the Women's Annex or in booking.[13] CCDC also had the option of transferring inmates to other detention facilities in Roosevelt County, New Mexico, and Bailey and Parmer Counties in Texas. *See supra* p. 10 (Undisputed Fact 27).

In the face of the undisputed existence of CCDC's policies, Plaintiff has offered no evidence that the policies are generally ignored, disregarded, or otherwise abandoned.[14] The

---

[11] *See supra* pp. 15-16 (adopting Def.'s Undisputed Material Fact 42 and its description of the "red-tag" system used by CCDC personnel at booking to identify separation issues between inmates).

[12] *See supra* pp. 9-10 (adopting Def.'s Undisputed Material Facts 20, 27, 29, and 31 which combine to reflect CCDC policies regarding documenting, investigating, and resolving disputes between inmates).

[13] Detention Officer Burbank explained the mechanics of the protective custody policy in her deposition. *See* Def.'s Mot., Ex. C at 3. Inmates could be moved to protective custody at their own request or they would affirmatively be given the option by an officer. *Id.* Officer Burbank explained: "However, in this instance, [Plaintiff] never asked to be PC'd. I had offered it to her at one point if she wanted to, and she had refused it; she didn't want to lose her worker status." *Id.* For her part, Plaintiff disputed that she was offered protective custody, but nonetheless affirmed her understanding that such an option was available. *See* Def.'s Mot., Ex. A at 6. She explained that she did not want to go into protective custody "[b]ecause I have anxiety and to be locked down in a cell would only worsen my anxiety." *Id.* Whether Plaintiff wanted to be in protective custody or would have thrived or decompensated in that environment is irrelevant. The important point is that the protective custody option clearly existed under Defendant's policies, Plaintiff knew of the option, and Plaintiff outright rejected it as a matter of personal preference. Consequently, whether Plaintiff was or was not offered the option by Officer Burbank is a factual question that does not need to be answered since Plaintiff would have refused it anyway.

[14] In addition to finding the existence of CCDC's classification and segregation policies undisputed, the Court further notes that Plaintiff has conceded the existence of the policies. *See* Pl.'s Resp. at 13 ("The Curry County Commission had a classification process in effect that was supposed to evaluate [an inmate's] 'history of assaultive behavior.'" (quoting Pl.'s Resp., Ex. 7)).

Court expected Plaintiff to submit evidence chronicling a temporally-relevant series of inmate assaults, the kind of evidence from which an inference could be drawn that CCDC was on notice that its classification and segregation policies were ineffective, misapplied, or disregarded. A pattern of violent assaults, if tolerated by CCDC without any effort to modify or strengthen its policies in response, might well have led the Court to conclude that whether the Board acted with deliberate indifference was a material fact question to be decided by a jury. But such evidence is not before the Court. Instead, Plaintiff has offered evidence only of her own beating in February 2014 and a *single other* altercation between male inmates more than two years earlier. *See* Pl.'s Additional Alleged Material Fact Q. Whatever else can be said of these two isolated incidents, they don't come close to creating a pattern or to suggesting a reasonable inference that the Board or CCDC was deliberately indifferent to the need to reasonably classify and segregate inmates based on their propensity for violence. In the end, Plaintiff has offered no evidence to contradict Defendant's evidence of its policies or to support her claim that Defendant instead had a policy or practice of either intentionally, or in a deliberately indifferent manner, placing inmates in dangerous housing conditions.

Because Plaintiff chose to sue only the Board of Commissioners as a municipal entity, the road for her to travel to defeat summary judgment was steep. It is not enough for her to submit evidence that *Detention Officer Burbank* (1) was on notice of the issues between Plaintiff and inmate Moore, (2) processed the relevant information and concluded that Plaintiff was in danger of being assaulted by inmate Moore, and (3) then was deliberately indifferent to that eventuality. Even that chain of events, the last link of which is entirely unsupported by Plaintiff's evidence, would not trigger municipal liability for it stops well short of demonstrating even an inference that the CCDC Administrator or County Manager had the same knowledge and

intent.[15] The Court has already found it to be undisputed that "Ms. Sandoval was not aware that Plaintiff had notified officers of her issues with [inmate] Moore" and was not aware that Plaintiff had any issues with Moore until after the tort claim was filed in this case. *See supra* pp. 12-13 (adopting Def.'s Alleged Undisputed Facts 33 and 28). And there is no evidence whatsoever that the County Manager had any relevant knowledge at all. Plaintiff's evidence is plainly insufficient to create even an inference that either final policymaker was deliberately indifferent to Plaintiff's safety or the need to protect her from inmate Moore.

To finish its analysis of Plaintiff's failure-to-protect claim, the Court is obliged to consider the "Additional Alleged Material Facts" that Plaintiff included in her response to Defendant's motion for summary judgment. *See* Pl.'s Resp. 9-14. Of the thirty-one (31) such facts, the vast majority touch at least in some way upon the failure-to-protect claim. As set forth below – again using Plaintiff's fact-lettering scheme – the Court concludes that none of these alleged material facts, whether alone or in combination, are sufficient to create a genuine issue of material fact for which a jury trial would be necessary.

A, DD. Officer Burbank opined in deposition that the Women's Annex was understaffed on the day of the beating. Whether her opinion would be admissible on that question or whether expert testimony would instead be required is beside the point. The Court finds this alleged fact to be immaterial because Plaintiff has failed to submit *any* admissible evidence that (1) links the staffing of the Women's Annex to any policy, custom, or decision by the Board – the only named defendant – or any final policymaker sufficiently empowered by law to make decisions that would trigger the possibility of *Monell* or municipal liability on the Board's behalf; (2)

---

[15] It is clear from their briefing that the parties agree that the only two county officials who conceivably qualify as "final policymakers" in this case are the Administrator Tori Sandoval and the County Manager Lance Pyle. Consequently, for the purpose of analyzing whether municipal liability arose in this case as a result of a decision or ratification by a "final policymaker," the Court has confined its review to the evidence associated with Sandoval and Pyle.

demonstrates that any such policy, custom, or decision *caused* Plaintiff's injuries inflicted by inmate Moore; or (3) suggests a genuine factual question that any such policy, custom, or decision was the product of deliberate indifference by the Board or its final policymakers.

B.  Officer Burbank's excerpted testimony establishes only that she herself was on notice that there was trouble brewing between Plaintiff and inmate Moore.  But that, of course, isn't the question.  The reason that this fact is immaterial is because no reasonable factfinder could find that these excerpts establish that the *Board* or any of its final policymakers was put on notice of (and then was deliberately indifferent to) the same.

C.  Whether a jail has a legal obligation to ensure its inmates do not fight is a question of law, not fact.

D, CC.  This deposition excerpt at most establishes that Officer Burbank, her unnamed shift supervisor, another unnamed shift supervisor, and an unknown number of fellow officers may have been on notice of inmate Moore's "aggressive and dangerous propensities."  Pl.'s Resp., Ex. 3 at 35.  Again, however, that factual showing is deficient, as it does not permit any reasonable factfinder to find that the *Board* or any of its final policymakers was put on notice of (and then was deliberately indifferent to) the same.  Whether Officer Burbank, the supervisors, or the other officers should have attributed more significance to the clues they had is immaterial because neither mere negligence nor respondeat superior is sufficient to trigger § 1983 liability.

E, EE.  Whether a one-time altercation between inmates was "totally preventable" is again beside the point.  This alleged fact is not material, as it does not at all show whether a policy, custom, or decision by the Board or its final policymakers caused Plaintiff's injuries.

F, G.   Whether Administrator Sandoval showed favoritism to certain employees and whether inspection reports were or were not falsified are irrelevant as Plaintiff has made no showing that either alleged fact played any role in causing her injuries.

L, M, N, R.   In conjunction, these alleged facts prove that the Board *had a policy* for what to do when two inmates "have issues."   There is no evidence that CCDC had a practice or custom of disregarding that policy.   Nor is there any evidence that the Board or any of its final policymakers made a decision not to investigate these "issues," much less that the Board or its final policymakers were deliberately indifferent to Plaintiff's safety in so deciding. Consequently, these alleged facts are not material.

O, P, S.   Whether the jail administrator ever decided on her own to provide the County Commission (or the district court) with a roster of inmates, the reasons they are being housed, and any criminal activity or fights that occurred during their stay there is immaterial to any claim in this case.

Q.   In proffering this alleged material fact, Plaintiff cites only to a *single* other fight between two male inmates that occurred more than *two years* before the beating that gave rise to this lawsuit.   To the extent that Plaintiff is proffering the evidence of the earlier fight to suggest that there is a pattern of this particular jail failing to protect inmates from predatory inmates, this scant proof is decidedly insufficient.

T.   Whether Ms. Sandoval refused to answer this question in her deposition is immaterial because it is irrelevant and inadmissible.

U.   Plaintiff's record citations do not support this alleged fact.   Moreover, whether the Perez-Guerra dispute from two years earlier was known to the Board is entirely speculative and therefore inadmissible.   Furthermore, Plaintiff has proffered no evidence that the Board or its

final policymakers were aware at all of any connection between Plaintiff and Moore to Perez and Guerra or knew that there were separation issues as between Plaintiff and Moore. Consequently, this alleged fact is immaterial.

V. Whether the county manager imposed discipline as a result of the earlier fight or micro-managed the jail is immaterial because it is irrelevant and inadmissible.

W. The logbook documents some sort of problem between Plaintiff and inmate Moore but is silent on any other relationship between them. Furthermore, Plaintiff has proffered no evidence that the Board or any of its final policymakers were aware of the contents of the logbook. For these reasons, this alleged fact is immaterial.

X. Whether the jail's record-keeping system in January-February 2014 should have evolved from handwritten to computerized is immaterial. Plaintiff proffers no evidence that a computerized system would have prevented the beating she suffered. The Court also finds that Plaintiff has in no way contested the "red tag" system used by the jail to identify inmate separation issues.

Y. This fact is immaterial because it is irrelevant and inadmissible.

Z, AA. Whether a jail has a legal obligation to provide safe and secure environments for its inmates, including preventing them from fighting, is a question of law, not fact.

At bottom, even after indulging all inferences in Plaintiff's favor, the Court is left with the firm belief that Plaintiff has failed to carry her burden of pointing to evidence sufficient to create a genuine issue of material fact that (1) the Board had a policy or custom of failing to protect inmates from other violent inmates at CCDC, (2) any such policy or custom was the product of the Board's purposeful intent or deliberate indifference, or (3) any such policy or custom was the "moving force" behind Plaintiff's injuries. In addition, Plaintiff has similarly

failed to carry her burden demonstrating that *any* CCDC employee, much less the Board or its final policymakers, acted with deliberate indifference to Plaintiff's safety.[16] The Court concludes that Defendant is entitled to judgment as a matter of law on the failure-to-protect component of Plaintiff's Fourteenth Amendment claim.

## B.      Failure to Provide Medical Treatment

The Court next turns to Plaintiff's two-fold criticism of the medical care provided to inmates at CCDC. Plaintiff first asserts that Defendant had a policy of systematically denying inmates access to medical care, *see* Pl.'s Compl. ¶ 54, and maintains that "[t]he medical care available at the detention center is inadequate and/or unavailable." *Id.* ¶ 55. Plaintiff also claims that she was *personally* denied proper medical care for the injuries she sustained as a result of the beating she underwent on February 1, 2014. *Id.* ¶ 23.

> A prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 102 (1976). "Deliberate indifference" involves both an objective and a subjective component. The objective component is met if the deprivation is "sufficiently serious." *Farmer*, 511 U.S. at 834. A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (further quotation omitted)). The subjective component is met if a prison official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.

*Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). It is not enough that a plaintiff proves medical negligence; rather, s/he must prove that the prison and/or its officials acted or

---

[16] Of course, municipal liability cannot be premised on respondeat superior. *See Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."). The Court makes this point only to emphasize that Plaintiff's evidence has failed to create a fact issue that *any* jail officer, irrespective of rank or title, acted with deliberate indifference.

failed to act with deliberate indifference to the plaintiff's serious medical needs. *See Perkins v. Kansas Dept. of Corrections*, 165 F.3d 803, 811 (10th Cir. 1999) (citing *Estelle*, 429 U.S. at 105-06).

The Court can make relatively short work of Plaintiff's claim that CCDC systematically denied medical care to its inmates generally, for the simple reason that Plaintiff has introduced no evidence to support the claim. In the light most favorable to Plaintiff, the most her evidence proves is that CCDC charged inmates a $10 fee before they could access medical services. Plaintiff has not submitted sufficient admissible evidence that this policy actually resulted in her (or any other inmate) being denied care for serious medical needs.

Had Plaintiff styled this lawsuit differently, the Court would address the issue of whether any individual officers were deliberately indifferent to Plaintiff's individual medical needs. But it is worth repeating that Plaintiff chose only to sue the Board as an entity. Therefore, as explained above, to defeat summary judgment, it was Plaintiff's burden to put forth some admissible evidence to support her claims that, *as a matter of policy or custom*, the Board deliberately denied CCDC inmates (including her) access to medical care. Plaintiff's best evidence is an excerpt from the deposition of Officer Burbank, who testified to her personal opinion that the policy requiring inmates to pay a fee for service is dangerous. Pl.'s Resp., Ex. 2 at 17. Officer Burbank opined that the policy is dangerous "[b]ecause there can be very serious issues going on and that inmate may not have the money to take care of it." *Id.*

But the Court would not have permitted Officer Burbank to testify that the $10 medical visit policy is "dangerous," as there is no showing of a proper foundation for the opinion. Putting that aside, an even stronger reason why this alleged fact does not prevent summary judgment is that Plaintiff nowhere and at no time has ever alleged that the $10 policy caused or

exacerbated any of her alleged injuries. The Court's analysis would have been more complicated had Plaintiff asserted, for example, that (1) she suffered objectively serious injuries from the beating; (2) she sought medical treatment for the injuries, (3) she was denied treatment because she couldn't come up with the $10 "pre-pay," and (4) she suffered some sort of exacerbation or prolongation of the injuries for which she was seeking treatment. But Plaintiff makes no such assertion, which renders her criticism of the policy immaterial. The Court will leave for another day and another case its analysis of the lawfulness of such a pre-pay policy.[17]

---

[17] Plaintiff's claim that she personally was denied proper medical care for injuries does not itself rise to the level of a municipal liability claim because she has presented no evidence that Defendant maintained a policy of denying inmates access to medical care or that Defendant's final policymakers either made or ratified a decision to deny her medical care. Nonetheless, the Court would also point out, under FED. R. CIV. P. 56(c)(3), that there is other evidence in the record that summarily defeats Plaintiff's claim that she was denied medical care. In connection with Defendant's first Motion for Summary Judgment [ECF No. 24], the Court on May 11, 2017, held an evidentiary hearing for the narrow purpose of determining whether Plaintiff was incapacitated by injury pursuant to N.M. STAT. ANN. § 41-4-16(B) (1977). *See* Order Setting Hr'g, ECF No. 32. After receiving testimony and documentary evidence at that hearing, the Court held that Plaintiff was not incapacitated by injury as a result of the beating she endured on February 1, 2014. *See* Mem. Op. and Order 11-18. Additionally, the Court made the following factual findings that are relevant to Plaintiff's current claim that she was denied medical care:

> 4. Plaintiff was evaluated immediately after the beating by a medical staffer at the jail whose first name is Guy. He shined a light in her eyes and asked how she was feeling. She was not transported to a hospital or a separate medical facility. She needed neither stitches nor staples, nor was she ever diagnosed with a concussion.

> 6. Plaintiff only made one request for medical treatment associated with the injuries she suffered during the beating. Pursuant to that request, she was taken to the main building where she saw a medical provider other than Guy and was given ibuprofen for her recurrent headaches. For the remainder of her incarceration at the Women's Annex, a medical officer periodically administered ibuprofen to her.

> 7. In addition to that one-time request, Plaintiff sent written requests to jail staff for medical conditions unrelated to the beating. *See* Def.'s Exs. A (April 3, 2014 request to be seen for carpal tunnel condition); B (March 2, 2014 request to be seen for eczema on elbow, as well as a head cold; also requested visit with mental health counselor); C (February 7, 2014 request to be seen for eczema).

> 8. Plaintiff consulted the mental health counselor at the jail at least once a week during the entirety of the four-month stay that is the subject of this lawsuit.

*Id.*

There is undisputed evidence that Plaintiff received medical care during her stay at the jail for the injuries she incurred as a result of the beating and for other unrelated issues, including mental health counseling and eczema. Therefore, Plaintiff's claim that she personally was denied medical care is entirely refuted by objective and admissible evidence.

For these reasons, the Court concludes that Plaintiff has failed to carry her burden of pointing to evidence sufficient to create a genuine issue of material fact that (1) the Board had a policy or custom of denying inmates access to medical care for their serious medical needs, (2) that any such policy or custom actually denied *her* any treatment for her own serious medical needs, or (3) that any such policy or custom was the product of the Board's purposeful intent or deliberate indifference. The Court further concludes that Defendant is entitled to judgment as a matter of law on the medical treatment component of Plaintiff's Fourteenth Amendment claim.

### C.     The Remaining Alleged Policies or Customs

In addition to the failure-to-protect and failure-to-treat components that together represent the gravamen of her Fourteenth Amendment claim, Plaintiff also alleges that the Board observed or tolerated a range of other policies or customs that violated her rights. Included among these are allegations that the Board failed to properly train and supervise its detention officers, failed to prevent overcrowding at the Women's Annex, failed to adequately staff the facility, failed to secure adequate funding to conduct jail operations, and failed to provide an adequate physical facility with respect to ventilation, design, roofing, and hygiene.

Whether these alleged practices are considered alone or in combination, Plaintiff has submitted no evidence sufficient to create a genuine issue of material fact that any one of them (1) existed in fact, (2) was the product of Defendant's deliberate indifference, and (3) actually caused Plaintiff's injuries. As one example, although Plaintiff alleges that the Board failed to adequately train and supervise its detention officers, she has submitted no evidence that identifies even a single specific training or supervision deficiency, much less that any such deficiency was borne out of deliberate indifference to inmate or institution safety. As another example, Plaintiff alleges that the Women's Annex was overcrowded, but she submitted no evidence to controvert

Defendant's evidence that the capacity of the Women's Annex was fifty-two (52) inmates and only forty-three (43) were in custody on the day of Plaintiff's beating. As still another example, Plaintiff has submitted no admissible evidence of any staffing shortfall, the size of the budget that Defendant should have been given to run the jail, or how either of these things were the product of the Board's deliberate indifference or in any way caused Plaintiff's injuries. And as a final example, Plaintiff's criticism of the physical characteristics of the Women's Annex are irrelevant as she introduced no evidence that links the building's ventilation, design, or condition to the injuries inflicted on her by inmate Moore.[18]

For these reasons, the Court concludes that Plaintiff has failed to carry her burden of pointing to evidence sufficient to create a genuine issue of material fact that any one of these alleged policies, customs, or practices (1) actually existed, (2) if so, was the product of purposeful intent or deliberate indifference by the Board or its final policymakers, or (3) in any way caused Plaintiff's injuries. The Court further concludes that Defendant is entitled to judgment as a matter of law on Plaintiff's Fourteenth Amendment claim insofar as it relates to these alleged policies.

## VII.  CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Defendant's "Motion for Summary Judgment No. II: Summary Judgment for the Board of County Commissioners" [ECF No. 33], is **GRANTED**.  **IT IS FURTHER ORDERED** that Count 1 of the Complaint is **DISMISSED WITH PREJUDICE**.

---

[18]  Plaintiff's Alleged Additional Material Facts I and J relate to the condition of the building.  *See* Pl.'s Resp. 10. The Court finds them to be immaterial because they are irrelevant to the causation of Plaintiff's injuries.

**IT IS SO ORDERED.**

_____

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***